# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **INFORMATION** |
| v. | 24 Cr. **547** |
| PAUL ROBERTS, | |
| Defendant. | |

**COUNT ONE**
(Securities Fraud)

The United States Attorney charges:

**Overview of the Accounting Fraud Scheme**

1.     In or about May 2017, PAUL ROBERTS, the defendant, founded Kubient, Inc. ("Kubient"), a digital advertising technology company headquartered in New York, New York. From in or about August 2020 to in or about November 2023, Kubient's shares were publicly traded on the Nasdaq stock exchange under the ticker "KBNT." At various times relevant to this Information, ROBERTS was Kubient's Chief Executive Officer, Chairman of the Board of Directors, Interim Chief Executive Officer, President, and Chief Strategy Officer.

2.     From at least in or about October 2019 through at least in or about March 2021, PAUL ROBERTS, the defendant, executed an accounting fraud scheme at Kubient. During that time, ROBERTS caused Kubient to improperly recognize more than $1.3 million in fraudulent revenue in Kubient's financial statements (the "Fraudulent Revenue"). The Fraudulent Revenue was over 94% of Kubient's reported revenue for 2020 at the time of its initial public offering ("IPO") in or about August 2020, over 74% of its reported revenue for 2020 at the time of its secondary public offering in or about December 2020, and approximately 45% of Kubient's reported revenue for all of 2020, as reported in Kubient's 2020 annual financial statement filed

with the United States Securities and Exchange Commission (the "SEC") on SEC Form 10-K in or about March 2021. With his scheme, ROBERTS misled Kubient's auditors and deceived the investing public about Kubient's financial condition.

3.    At the core of the accounting fraud scheme by PAUL ROBERTS, the defendant, was a fraudulent $1.3 million transaction that ROBERTS arranged between Kubient and another digital advertising technology company ("Company-1") and one of Company-1's affiliates (the "Company-1 Affiliate"). In a set of three contracts negotiated and executed together in or about October 2019, Kubient and Company-1 agreed to provide certain services to the other for nearly identical fees. Under the terms of two contracts, Kubient agreed to use its proprietary fraud detection tool Kubient Artificial Intelligence ("KAI") to scan data provided by Company-1 and the Company-1 Affiliate for instances of digital ad fraud and then deliver the results of KAI's findings to Company-1 and the Company-1 Affiliate (the "KAI Agreements" of the "KAI Transactions"). At the same time, pursuant to a Data Services Agreement, Company-1 agreed to sell Kubient other data and provide certain data-related services.

4.    From in or about January 2020 through in or about November 2020, Kubient paid Company-1 $1,300,336 and Company-1 paid Kubient $1,300,338.03 (which Kubient fraudulently recognized as revenue), but neither company ever provided any of the services they agreed to provide to the other company under the contracts. For example, with respect to the KAI Transactions, Company-1 and the Company-1 Affiliate never sent Kubient any data to be scanned by KAI, Kubient never scanned any Company-1 or Company-1 Affiliate data with KAI, and Kubient never delivered any results or reports to Company-1 or the Company-1 Affiliate with any findings by KAI.

2

5.      To conceal his fraudulent scheme, PAUL ROBERTS, the defendant, directed Kubient employees to generate fake KAI reports and misled them about how he intended to use such reports. Rather than receive data from Company-1 or the Company-1 Affiliate to be scanned by KAI, ROBERTS had Kubient employees create "sample" KAI reports based, at first, on Kubient's own data and then eventually based on made-up metrics and no underlying data at all. ROBERTS told Kubient employees he needed these "samples" to demonstrate for bankers and potential investors the kind of reporting of which KAI was capable. In fact, ROBERTS needed the "sample" KAI reports to mislead Kubient's independent certified public accountants (the "Audit Firm") into believing that Kubient had performed its contractual obligations to Company-1 and the Company-1 Affiliate under the KAI Agreements when, in fact, Kubient had not, so that Kubient could recognize the associated revenue in its financial statements.

6.      PAUL ROBERTS, the defendant, repeatedly made material misrepresentations in SEC filings and in management representation letters submitted to the Audit Firm relating to Kubient's KAI revenue recognition. Contrary to representations ROBERTS made in these filings and letters, Kubient did not perform its obligations to Company-1 and the Company-1 Affiliate under the KAI Agreements and, consequently, none of the Fraudulent Revenue should have been recognized as revenue in Kubient's financial statements.

7.      In addition, PAUL ROBERTS, the defendant, repeatedly made material misrepresentations in SEC filings about the efficacy of KAI in identifying and preventing digital ad fraud, including in connection with Kubient's initial and secondary public offerings when Kubient was touting KAI as one of the company's premier products that would differentiate it from its competitors. For example, ROBERTS personally added language to Kubient's SEC Form S-1 registration statements that ROBERTS signed and that Kubient filed in or about July, August,

3

and December 2020, stating that, in 2020, KAI provided "two large enterprise clients" [i.e., Company-1 and the Company-1 Affiliate] "the ability to prevent the purchase of non-human or fraudulent advertising traffic" and that "KAI was identifying and preventing approximately 300% more digital ad fraud then [sic] the client's current partners." ROBERTS made these statements knowing that they were false. More specifically, ROBERTS knew that Kubient never received any data from Company-1 or the Company-1 Affiliate to scan with KAI pursuant to the KAI Agreements, that Kubient never scanned any of Company-1's or the Company-1 Affiliate's data with KAI, and that Kubient never delivered any results or reports to Company-1 or the Company-1 Affiliate with any findings by KAI, let alone that KAI was not "identifying and preventing approximately 300% more digital ad fraud" than Company-1's and the Company-1 Affiliate's "current partners."

8.     Fueled by the misrepresentations about Kubient's KAI revenue recognition and the efficacy of KAI in identifying and preventing digital ad fraud that PAUL ROBERTS, the defendant, made in Kubient's SEC filings and elsewhere, Kubient raised more than $12.5 million in its IPO in or about August 2020, resulting in its shares being publicly traded on the Nasdaq stock exchange, and more than $20 million in its secondary public offering in or about December 2020. Kubient's IPO and its secondary public offering would not have been possible without ROBERTS's fraudulent misrepresentations about KAI and the KAI Transactions.

9.     From the time of Kubient's IPO in or about August 2020 until at least in or about March 2021, PAUL ROBERTS, the defendant, was Kubient's largest shareholder with over two million shares. While ROBERTS did not sell his Kubient shares, his shares were worth, at their highest point, more than $32 million.

**Background on the Digital Advertising Technology Industry**

10.    When consumers browse a webpage, watch a video on the internet, use a mobile app or watch an internet-connected TV, there is often a behind-the-scenes auction for the purchase and sale of digital advertising space as the consumer's desired content loads. In these auctions, advertisers (i.e., ad space buyers, such as consumer products manufacturers) purchase advertising space from publishers (i.e., ad space sellers, such as mobile app developers or website operators). Advertisers bid on each ad impression—i.e., each time an ad is displayed. If the bid is won, the ad is displayed on the publisher's website or app being viewed by the consumer. These auctions involve an automated, real-time bidding process for each digital ad that takes places in a 300-millisecond window called the "bid stream." The auctions determine what ad will display, where it will be displayed, and what price the advertiser must pay to the publisher for displaying the ad.

11.    The advertising inventory that is bought and sold in these real time auctions during the bid stream is customized to each individual viewer. This viewer customization is often called "programmatic advertising," a form of advertising where advertisers can specifically target their preferred audiences and demographics (rather than placing ads in generic public forums such as billboards, in hopes that the coveted audience or demographic sees the ad). Digital programmatic advertising's reach includes channels such as online, mobile browsing, in-app, text messages, "out of home" video advertising (in locations such as gas stations and airports) and digital or internet television services.

12.    One of the primary challenges facing the digital advertising industry is advertising fraud. Digital advertising fraud occurs when an ad is displayed to a fake website or Bot in an effort to falsely inflate web traffic numbers, rather than being displayed to a legitimate web site to be viewed by a human being. An advertiser that pays for an ad that is displayed to a Bot has wasted

the budget spent for the placement of that ad, as it is human beings that might spend money on the product or service being advertised, as opposed to a Bot. Thus, brands and advertisers that cannot prevent their ads being shown to Bots become victims to billions of dollars lost to ad fraud annually.

### Background on ROBERTS, Kubient, and KAI

13.    From in or about May 2017 until in or about September 2023, PAUL ROBERTS, the defendant, served at various times as the Chief Executive Officer, Interim Chief Executive Officer, Chief Strategy Officer, President, and Chairman of the Board of Directors of Kubient, as summarized in the table below:

| May 2017 until May 2019 | Chief Executive Officer, Chairman of the Board of Directors |
|---|---|
| May 2019 to October 2020 | Chief Strategy Officer, President, and Chairman of the Board of Directors |
| October 2020 to December 2021 | Interim Chief Executive Officer, Chief Strategy Officer, President, and Chairman of the Board of Directors |
| December 2021 to September 2023 | Chief Executive Officer, Chief Strategy Officer, President, and Chairman of the Board of Directors |

14.    From in or about 2019 to at least in or about March 2021, Kubient touted two significant products: (1) the Audience Cloud, and (2) KAI.

15.    Typically, advertisers use demand-side platforms ("DSPs") to purchase digital advertising, whereas publishers use completely different platforms called supply-side platforms ("SSPs") to sell advertising space to those advertisers. The Audience Cloud was a cloud-based software platform for real-time trading of digital, programmatic advertising that enabled advertisers and publishers to transact directly between each other on a single platform.

16.    To combat the problem of digital advertising fraud discussed above, Kubient developed KAI, a fraud detection tool that used artificial intelligence to analyze live advertising

bid stream data to detect potential ad fraud. The stated goal of KAI's proprietary technology was to allow all advertisers to make better-informed, decisions within a brief window of time by identifying potentially fraudulent activity in real-time. Kubient advertised KAI as a tool that could be fully integrated into Kubient's Audience Cloud marketplace, or alternatively, that could be deployed as a standalone application or enterprise solution on third-party, real-time bidding platforms. Before the KAI Transactions with Company-1 and the Company-1 Affiliate in or about October 2019, Kubient had not charged any customers for the use of KAI or recognized any stand-alone revenue in connection with KAI.

### The KAI Agreements and the Data Services Agreement

17.    In or about the fall of 2019, PAUL ROBERTS, the defendant, was exploring an IPO for Kubient. At the time, however, Kubient was not generating significant revenue. For the nine months ending on September 30, 2019, Kubient recognized net revenue of only $161,828.

18.    In an effort to generate more significant revenue for Kubient and to demonstrate to the market the efficacy of its signature product, KAI, in advance of an IPO, in or about October 2019, PAUL ROBERTS, the defendant, executed a fraudulent transaction between Kubient, on the one hand, and Company-1 and the Company-1 Affiliate on the other. Specifically, at that time, ROBERTS negotiated and signed, on behalf of Kubient, (1) the KAI Agreements (one with Company-1 and one with the Company-1 Affiliate), and (2) the Data Services Agreement with Company-1.

19.    Under the terms of the KAI Agreements, Kubient agreed to "process and score post impression data using its proprietary K.A.I. Fraud Prevention system and provide the results to [Company-1 and the Company-1 Affiliate] on a continual basis." To do that, however, Company-1 and the Company-1 Affiliate had to "provide Kubient raw data up to the [impression]

total[s]" listed in the KAI Agreements. The KAI Agreements contemplated three terms of service: October, November, and December 2019, with a maximum of 2.4 billion impressions each month for Company-1 and a maximum of three billion impressions each month for the Company-1 Affiliate. The "CPMs" (costs per mille), or the costs for every 1,000 impressions scanned by KAI, were listed in the KAI Agreements as $0.13 for Company-1 and $0.07 for the Company-1 Affiliate. Accordingly, the KAI Agreements provided for a maximum cost to Company-1 and the Company-1 Affiliate of $936,000 and $630,000, respectively, for a total maximum price of $1,566,000.

20.    Kubient never performed any of the services that it was required to perform under the KAI Agreements for Company-1 or the Company-1 Affiliate.

21.    Under the terms of the Data Services Agreement, Kubient agreed to pay Company-1 $500,000 per month for three months of data services—October, November, and December 2019—for a total of $1.5 million: only $66,000 less than the maximum fees of $1.566 million contemplated by the KAI Agreements for the same three-month service period. Under the terms of the Data Services Agreement, Kubient was required to provide Company-1 with "an initial file of customer records." Company-1, in turn, was required to match that data from Kubient against Company-1's proprietary or partners' data to enable certain data enrichment, segmentation, audience creation, and activation services called for by the agreement.

22.    Company-1 never performed any of the services that it was required to perform under the Data Services Agreement for Kubient.

### ROBERTS Begins Billing for KAI Services That Were Never Performed

23.    In or about early November 2019, about a week after the KAI Agreements and the Data Services Agreement were executed, PAUL ROBERTS, the defendant, began billing Company-1 for KAI services that were never performed.

8

24.     On or about November 8, 2019, PAUL ROBERTS, the defendant, emailed employees at Company-1, seeking $497,080.12 for "billable activity from our fraud tool [KAI] in October." In fact, neither Company-1 nor the Company-1 Affiliate had provided any data to Kubient to be scanned by KAI, nor had Kubient scanned any such data with KAI.

25.     A few days later, on or about November 12, 2019, PAUL ROBERTS, the defendant, sent a message to a Kubient employee ("Employee-1"), saying that he had "two very significant invoices we need to create" for Company-1 and for the Company-1 Affiliate for services under the KAI Agreements for the month of October. Employee-1, knowing that no data had yet been provided by Company-1 or the Company-1 Affiliate to Kubient to be scanned by KAI, told ROBERTS, "this will be a problem, the audit will demand to see a report justifying the KAI activity, and that KAI was used." ROBERTS responded, "Ok I will tell them to send me all the data," acknowledging that Kubient had not received any data to be scanned by KAI at this point. Employee-1 agreed to create the invoices, but reiterated, "We need the data for October from them that we can check, cause otherwise we can't justify this in an audit. . . . we need that data ASAP after I send [the invoices] cause without it we will have issues." ROBERTS replied, "I get the issue," and promised that he would "get it sorted." ROBERTS, however, made no effort to obtain the data called for by the KAI Agreements and continued to bill Company-1 and the Company-1 Affiliate for services that were never performed.

26.     Rather than obtain the data needed to perform the services called for by the KAI Agreements, PAUL ROBERTS, the defendant, began taking steps to make it look like Kubient would be receiving the data from Company-1 and the Company-1 Affiliate, when, in fact, ROBERTS had no intention of obtaining such data. On or about November 14, 2019, ROBERTS emailed a Kubient employee ("Employee-2"), stating that Kubient has "TWO new clients that will

be sending us a large amount of ad impression bid data to score for them using KAI. We need to create bucket[s] [i.e., online data storage folders] for the client to send the data," and, "Please label one [Company-1] KAI and the second [the Company-1 Affiliate] KAI." Employee-2 agreed and sent ROBERTS links to two online data storage folders (the "Data Folders").

<strong>Kubient Files its First Draft Registration Statement on SEC Form S-1</strong>

27.    On or about November 26, 2019, Kubient filed its first draft registration statement with the SEC on Form S-1 as part of its efforts to consummate an IPO. The draft Form S-1 noted that Kubient's "net revenue was $106,422 for the year ended December 31, 2018," but that, based on a "growth strategy," Kubient was "hopeful" that its revenues would "increase." One of the "key elements" of Kubient "long-term growth strategy" was described in the draft Form S-1 as, "[f]urther developing our fraud prevention system, which is powered by our proprietary KAI machine learning technology."

<strong>ROBERTS Continues Billing for KAI Services That Were Never Performed</strong>

28.    In or about December 2019 and January 2020, PAUL ROBERTS, the defendant, continued to have Kubient invoice Company-1 and the Company-1 Affiliate for services that Kubient never provided under the KAI Agreements. On or about December 23, 2019, December 27, 2019, and January 10, 2020, ROBERTS sent messages to Employee-1 directing Employee-1 to create invoices charging Company-1 and the Company-1 Affiliate for services under the KAI Agreements as follows (the "Invoices"):

| Invoice Amount | Impressions Total | CPM | Entity | Month of Service |
|---|---|---|---|---|
| $232,524.65 | 1,788,651,134 | $0.13 | Company-1 | October 2019 |
| $165,139.45 | 2,359,134,934 | $0.07 | Company-1 Affiliate | October 2019 |
| $260,236.22 | 2,001,817,100 | $0.13 | Company-1 | November 2019 |
| $197,120.59 | 2,816,008,468 | $0.07 | Company-1 Affiliate | November 2019 |
| $276,526.12 | 2,127,124,001 | $0.13 | Company-1 | December 2019 |
| $168,791.00 | 2,411,300,000 | $0.07 | Company-1 Affiliate | December 2019 |

10

ROBERTS fabricated the impression totals to be included in the Invoices. ROBERTS knew that Company-1 and the Company-1 Affiliate never sent Kubient any data to be scanned by KAI, and that Kubient never scanned any data from Company-1 or Company-1 Affiliate data with KAI as the KAI Agreements required. Nonetheless, at ROBERTS's direction, Employee-1 created the Invoices according to the above specifications that ROBERTS demanded and sent them to ROBERTS. On or about December 27, 2019, and January 10, 2020, ROBERTS emailed the Invoices, which totaled $1,300,338.03, to employees of Company-1.

29. On or about January 21, 2020, Company-1 paid the October and November 2019 Invoices in full, for a total of $855,020.91, by wire transferring that amount to one of Kubient's New York, New York-based bank accounts (the "Kubient Bank Account").

30. On or about January 31, 2020, Employee-1, at ROBERTS's direction, wired Company-1 $255,019 as payment for services under the Data Services Agreement, even though, in fact, no services had been performed by Company-1 under the Data Services Agreement.

### ROBERTS Has Fake KAI Reports Created to Cover-Up His Fraudulent Scheme and Mislead Kubient's Audit Firm

31. PAUL ROBERTS, the defendant, knew that he needed to provide supporting documentation to the Audit Firm by March 31, 2020, showing that Kubient had performed its obligations under the KAI Agreements, for Kubient to recognize revenue in its financial statements for the first quarter of 2020 based on the KAI Transactions. For example, on or about January 30, 2020, a Kubient employee ("Employee-3") sent a message to ROBERTS, saying, "Reminder (for me too) we need to get support from [Company-1] for the [KAI Agreements and the Data Services Agreement] transactions." ROBERTS responded with a thumbs-up emoji. Then, on or about February 6, 2020, Employee-3 messaged ROBERTS again, asking "where we stand with

11

[Company-1]" regarding "documentation" of the KAI Transactions and the Data Services Agreement. On or about February 14, 2020, Employee-3 messaged ROBERTS again, asking "any luck with [Company-1] on that stuff? its gonna be 3/31 before we know it." ROBERTS responded, "doing my best man." ROBERTS knew, however, that Kubient had not provided any services to Company-1 or the Company-1 Affiliate under the KAI Agreements and, therefore, that there was no documentation indicating that it had. Accordingly, ROBERTS set out to falsify such documentation.

32.    On or about February 19, 2020, PAUL ROBERTS, the defendant, messaged Employee-2 and told Employee-2 to populate the Company-1 and Company-1 Affiliate Data Folders with Kubient's own data (rather than data from Company-1 or the Company-1 Affiliate) to later be scanned by KAI. ROBERTS falsely told Employee-2 that "[t]he purpose of all of this" was "to show an investor a process of analyzing data POST Impression." ROBERTS explained, "we are going to use our own data but put it into these buckets as a sample." Then ROBERTS would ask another Kubient employee ("Employee-4") to "run a report on each month, by client and create a 'fraud analysis report,'" because "the investor wants to see the process of how it would possibly work for clients."

33.    The February 19, 2020 messages from PAUL ROBERTS, the defendant, to Employee-2, however, were false. ROBERTS was not seeking to generate "sample" KAI reports based on Kubient's own data to show "an investor... how it would possibly work for clients," as he told Employee-2. Instead, ROBERTS was seeking to generate fraudulent KAI reports that he would falsely present to the Audit Firm as based on data from Company-1 and the Company-1 Affiliate as proof that Kubient had performed its obligations under the KAI Agreements, when, in fact, Kubient had not.

12

34.     On February 20, 2020, Employee-2 sent a message to PAUL ROBERTS, the defendant, reporting that Employee-2 had loaded Kubient data in the Company-1 and Company-1 Affiliate Data Folders. After receiving that response, ROBERTS sent a message to Employee-3, saying "Btw....[Company-1] data was delivered." That statement by ROBERTS was false. Company-1 had not "delivered" any data to Kubient. Instead, at ROBERTS's direction, Employee-1 populated the Company-1 and Company-1 Affiliate Data Folders with Kubient's "own data." In response to ROBERTS's message, Employee-3 asked, "did we 'scan' it?," and ROBERTS responded, "Today that will happen."

35.     On or about February 28, 2020, Kubient paid Company-1 $100,000 from the Kubient Bank Account, even though Company-1 had not provided any services under the Data Services Agreement.

36.     On or about March 3, 2020, Employee-3 sent PAUL ROBERTS, the defendant, a message, saying "not that u need a reminder" but the "KAI revenue needs to be 'wrapped up' before the end of THIS month." Employee-3 sent ROBERTS a to-do list and under the heading "Audit support" was an item "need report of [Company-1] data scanned in KAI." ROBERTS responded with a thumbs-up emoji. In fact, as ROBERTS knew, no such report existed as Kubient never scanned any data from Company-1 or the Company-1 Affiliate with KAI pursuant to the KAI Agreements. Accordingly, ROBERTS set out to have fraudulent KAI reports created.

37.     On or about March 6, 2020, at the request of PAUL ROBERTS, the defendant, Employee-2 emailed links to the Company-1 and Company-1 Affiliate Data Folders, which contained Kubient's own data, to ROBERTS and Employee-4. After receiving the links from Employee-2, ROBERTS sent messages to Employee-4, asking Employee-4 to "run the data [in the Data Folders] through KAI." Employee-4 pointed out to ROBERTS, however, that the data in the

13

Data Folders (which was Kubient data, not Company-1 or Company-1 Affiliate data) included fields indicating that the data, in fact, had already been run through KAI. Furthermore, Employee-4 pointed out to ROBERTS and Employee-2 that the files in the Company-1 and Company-1 Affiliate Data Folders "are identical"—for example, the Company-1 November 2019 file had the same data as the Company-1 Affiliate November 2019 file. ROBERTS ignored the concerns that Employee-4 raised.

38.    On or about March 12, 2020, PAUL ROBERTS, the defendant, sent Employee-4 a message, saying, "Hey can you forward me the report you did for the data [Employee-2] provided." Employee-4 reiterated the concern Employee-4 raised six days before that "[t]he data for [Company-1] and [the Company-1 Affiliate] [is the] same." ROBERTS again ignored the issue and said, "ok can you send me the report please[.]" Employee-4 then emailed ROBERTS a KAI report that Employee-4 had created based on Kubient's own data that Employee-2 had uploaded to the Company-1 and Company-1 Affiliate Data Folders at the direction of ROBERTS (the "March 12 KAI Report"). The March 12 KAI Report listed fraud statistics for November and December 2019, but not October 2019, and did not differentiate between which fraud metrics corresponded to Company-1 data and which to Company-1 Affiliate data.

39.    On or about March 12, 2020, after receiving the March 12 KAI Report from Employee-4, PAUL ROBERTS, the defendant, asked Employee-2 to "change the [Company-1] data to new data that does not match [the Company-1 Affiliate]" in the Data Folders. Employee-2 complied.

40.    Meanwhile, Employee-3 continued to press PAUL ROBERTS, the defendant, for audit support documentation related to Kubient's work on the KAI Transactions. On or about March 18, 2020, Employee-3 emailed ROBERTS and asked him to provide the KAI reports related

14

to the KAI Transactions "ASAP so [the Audit Firm, which was conducting an audit of Kubient's 2019 financial statements,] can wrap up their procedures." The next day, on or about March 19, 2020, Employee-3 sent ROBERTS a message, emphasizing the need to review "open audit items." ROBERTS responded with a screenshot of the March 12 KAI report Employee-4 created at ROBERTS's direction. The next day, on or about March 20, 2020, Employee-3 messaged ROBERTS and said, "just to remind myself – you are getting me this report for Oct, Nov, and Dec, right?," and sent ROBERTS the same screenshot of the March 12 KAI report that Roberts had previously sent Employee-3. ROBERTS responded, "Yea just need an hour to sit and do it all in a clean format."'

41.     With the end of the quarter—and the deadline for providing the Audit Firm with supporting documentation for the KAI Transactions—rapidly approaching, PAUL ROBERTS, the defendant, did not have the documentation he needed to conceal his fraudulent scheme from the Audit Firm. The KAI Agreements required Kubient to report the results of KAI's scanning of six different sets of data—data provided by Company-1 for the months of October, November, and December 2019, and data provided by the Company-1 Affiliate for the months of October, November, and December 2019. The March 12 KAI Report that ROBERTS had Employee-4 create based on Kubient's own data, however, only purported to report the results of two sets of data—data aggregated from both Company-1 and the Company-1 Affiliate for November 2019 and for December 2019. Thus, ROBERTS could not convincingly provide the March 12 KAI Report to the Audit Firm as proof that Kubient had satisfied its obligations under the KAI Agreements. ROBERTS, accordingly, took steps to have new fraudulent KAI reports created. This time, however, ROBERTS simply made up the numbers to include in the reports based on no data at all, rather than having Kubient employees scan more of Kubient's own data with KAI.

42.     On or about March 24, 2020, PAUL ROBERTS, the defendant, sent a message to Employee-4, saying "the report you sent me for [Company-1]/[the Company-1 Affiliate][i.e., the March 12 KAI Report]. I need to recreate those as material for the bankers road show as a 'Sample' of reporting we can provide …I will send you a quick email with the idea and let me know if you can do it." ROBERTS then emailed Employee-4, "As part of our banking presentation, I would like to use the report as templates you compiled prior for [Company-1] and [the Company-1 Affiliate]. Typically, the discussions are around quarterly numbers so I would like you to create the same report, but separate them as one report for [Company-1] and one for [the Company-1 Affiliate]. I would like to use the following data for each partner/month and create individual reports." ROBERTS's email provided Employee-4 with the following data:

| Entity | Month of Service | Impressions Scanned | Total Fraud |
|---|---|---|---|
| Company-1 | October 2019 | 2,235,813,918 | 22% |
| Company-1 Affiliate | October 2019 | 2,948,918,668 | 31% |
| Company-1 | November 2019 | 2,001,817,100 | 19% |
| Company-1 Affiliate | November 2019 | 2,816,008,468 | 33% |
| Company-1 | December 2019 | 2,127,124,001 | 28% |
| Company-1 Affiliate | December 2019 | 2,411,300,000 | 28% |

The November and December impressions scanned totals in ROBERTS's March 24, 202 email matched the impressions totals in Kubient's November and December Invoices to Company-1 and the Company-1 Affiliate. The October impression totals, however, did not. The "total fraud" percentages were made up by ROBERTS and not based on any data.

43.     After sending the email with the fake KAI metrics, on or about March 24, 2020, ROBERTS sent messages to Employee-4, saying, "I just sent you an email ⎯ The goal is to be able to show sample reports by two current clients that are easily understandable to bankers and potential investors ⎯ I gave you new impression levels to use and possible fraud levels to include, all the other inputs can be up to you." In short, ROBERTS asked Employee-4 to create "sample"

KAI reports untethered to actual data and instead based on "possible fraud levels" and "other inputs" that could "be up to" Employee-4, so that ROBERTS could show the "sample" reports to "bankers and potential investors." ROBERTS, however, did not intend to use such "sample" reports for "bankers and potential investors." Instead, ROBERTS intended to use these "sample" reports with made-up fraud numbers to mislead the Audit Firm into believing that Kubient had actually scanned data from Company-1 and the Company-1 Affiliate with KAI and delivered reports to Company-1 and the Company-1 Affiliate with the results, as required by the KAI Agreements.

44.     While the March 24, 2020 email from PAUL ROBERTS, the defendant, provided Employee-4 with the total fraud percentages ROBERTS wanted Employee-4 to include in the reports for each month, ROBERTS did not provide a breakdown of the different categories of ad fraud—for example, user fraud, device fraud, user agent fraud, traffic fraud, and content fraud— that KAI was able to detect and differentiate between in its reporting. Thus, on or about March 24, 2020, Employee-4 responded to ROBERTS and asked, "just saw the email. A quick question, do we need segregation based on the type of fraud?" ROBERTS responded: "it would help to add that, but you can just leave percentages which all equal 100%." Employee-4 noted, however, "for me to know the category wise fraud levels, I would have to know the source of the data to dig deeper do you have the raw data from where you got these percentages?"

45.     In response, on or about March 24, 2020, PAUL ROBERTS, the defendant, revealed, "*there is no data* - I just need sample reports to present so you can use any percentages on the type of fraud." (emphasis added). In short, ROBERTS was directing Employee-4 to make up sub-percentages for the various categories of ad fraud. ROBERTS explained further, "each investor meeting now gets more granular and as we talk about products like KAI - I need to go

through the whole journey | here is what we built - here is why it is important | and here is what the client reporting will look like " ROBERTS told Employee-4 that he "showed the bankers the original report you created... they loved the format, they just suggested as a sample report we increase the data amount evaluated and break it out into two different company reports." Employee-4 then agreed to "break down the fraud into categories based on my knowledge and the trends we observe in our data."

46.    Later that day, on or about March 24, 2020, Employee-4 emailed ROBERTS two KAI reports: one report for Company-1 for October, November, and December 2019, and the other for the Company-1 Affiliate for October, November, and December 2019 (the "March 24 KAI Reports"). The March 24 KAI Reports included the impression totals and total fraud percentages that ROBERTS provided to Employee-4 as well as a breakdown of the categories of fraud based on trends Employee-4 observed in Kubient's own data.

47.    Contrary to what PAUL ROBERTS, the defendant, told Employee-4, ROBERTS did not intend to use—and, in fact, did not use—the March 24 KAI Reports as "sample reports" for "investor meeting[s]" and "bankers." Instead, ROBERTS intended to use the March 24 KAI Reports—which he acknowledged were based on "no data" and for which he instructed Employee-4 to "use any percentages on the type of fraud"—to mislead the Audit Firm into falsely believing that Kubient had scanned data from Company-1 and the Company-1 Affiliate and complied with its obligations under the KAI Agreements.

48.    PAUL ROBERTS, the defendant, shared the March 24 KAI Reports with Employee-3, who had been asking ROBERTS for documentation of Kubient's performance of its obligations under the KAI Agreements since at least on or about January 30, 2020, so that Employee-3 could share such documentation with the Audit Firm. While reviewing the March 24

KAI Reports, on or about March 25, 2020, Employee-3 noticed that the impression totals in the reports did not match the impression totals in the October Invoices. On or about March 25, 2020, Employee-3 asked ROBERTS, in substance, whether Employee-3 should change the impression totals for October in the March 24 KAI Reports to match the impression totals in the October Invoices. ROBERTS responded, "Yes." Employee-3 then changed the impression totals (the "March 25 KAI Reports").

49.     On or about March 26, 2020, Employee-3 sent an email to personnel of the Audit Firm, who at that time were auditing Kubient's 2019 financial statements, copying PAUL ROBERTS, the defendant. With respect to the KAI Agreements, Employee-3 said, "Kubient scanned [Company-1] and [Company-1 Affiliate] data with KAI - The general background is [Company-1] and [Company-1 Affiliate] (related parties) provided data to us to scan in KAI. The terms of the [KAI Agreements] (which you have seen, but are attached for your convenience) provides that we are paid on a per CPM basis. Attached are the results of our scan." Employee-3 attached the March 25 KAI Reports.

50.     Contrary to the statements in Employee-3's email, Company-1 and the Company-1 Affiliate never provided Kubient any data to be scanned by KAI, Kubient never scanned any Company-1 or Company-1 Affiliate data with KAI, and Kubient never delivered any results or reports (not even the fraudulent March 25 KAI Reports) to Company-1 or the Company-1 Affiliate with any findings by KAI.

51.     On or about June 1, 2020, Employee-3 asked PAUL ROBERTS, the defendant, "u know those KAI scoring reports we did? ... did they get sent to [Company-1]/[the Company-1 Affiliate]?" ROBERTS responded, "yes they did get sent." Employee-3 asked: "was there any reply?" ROBERTS responded, "nothing of merit." Employee-3 then asked, "But was there a reply?

Like thanks for sending?" ROBERTS said, "wait – no they did not respond directly to that email."

Contrary to what ROBERTS told Employee, no KAI reports or results (including the March 25

KAI Reports) were ever sent to Company-1 or the Company-1 Affiliate.

### ROBERTS Makes Material Misrepresentations in Kubient's IPO Registration Statements and in a Management Representation Letter to the Audit Firm

52.    Under the Securities Act of 1933, domestic issuers of securities must file a

registration statement with the SEC on Form S-1 to publicly offer new securities. In anticipation

of its IPO, on or about July 2, 2020, Kubient filed its first registration statement on SEC Form S-

1, which was signed by, among others, PAUL ROBERTS, the defendant, as the Chief Strategy

Officer, President, and Chairman of the Board of Directors of Kubient. The July 2, 2020

registration statement was later amended on or about July 13, 2020, July 30, 2020, August 6, 2020,

August 7, 2020, and August 10, 2020 (collectively, the "IPO Registration Statements").

53.    The IPO Registration Statements touted KAI as among the "key elements" of

Kubient's "long-term growth strategy," including (1) "[f]urther developing our fraud prevention

system, which is powered by our proprietary KAI machine learning technology, which we are

expecting to be widely incorporated into our service offerings in the third fiscal quarter of 2020,"

and (2) "[f]urther diversifying both our products and revenue streams to include stand-alone

applications that address advertisers' business needs, such as KAI for real time fraud prevention[.]"

54.    The following paragraph was included in the IPO Registration Statements in the

"customers and revenue" section of the "prospectus summary" and then repeated in a later section

describing Kubient's business:

> During the quarter ended March 31, 2020, we allowed two large
> enterprise clients to beta test KAI in a live isolated environment.
> Kubient was able to successfully ingest hundreds of millions of rows
> of data in real-time and provide our clients the ability to prevent the
> purchase of non human or fraudulent advertising traffic. The results

20

from the two beta clients indicated that KAI was identifying and preventing approximately 300% more digital ad fraud then the client's current partners. The large volume of data ingested helped to improve our proprietary algorithms including the supervised and unsupervised version. This was invaluable as it provided us an opportunity to stress test our ability to handle large scale, concurrent input of data into our system which is then analyzed using our patent-pending proprietary machine learning technology. While KAI was monetized in the first quarter of 2020, we are currently determining the best pricing model based on SMB and enterprise client usage and expect KAI to be widely adopted as a standalone enterprise product in the third fiscal quarter of 2020.

(the "KAI Beta Test Section").

55.     PAUL ROBERTS, the defendant, added the KAI Beta Test Section in track changes to Kubient's working draft of what would become the July 2, 2020 Form S-1 registration statement. ROBERTS made certain additions—including the sentence "The results from the two beta clients indicated that KAI was identifying and preventing approximately 300% more digital ad fraud then the client's current partners"—on or about July 1, 2020—i.e., one day before the July 2, 2020 Form S-1 was filed. The KAI Beta Test Section that ROBERTS authored included multiple material misrepresentations:

a.     As part of the KAI "beta test" with Company-1 and the Company-1 Affiliate, Kubient did not "successfully ingest hundreds of millions of rows of data in real-time." In fact, neither Company-1 nor the Company-1 Affiliate ever provided Kubient any data to scan with KAI, let alone "hundreds of millions of rows of data in real-time." Consequently, there was no "large volume of data ingested" that "helped [Kubient] to improve [its] proprietary algorithms." Since the beta test was fabricated, it was not "invaluable" and it did not "provide[] [Kubient] an opportunity to stress test [its] ability to handle large scale, concurrent input of data into [its] system which is then analyzed using [its] patent-pending proprietary machine learning technology."

21

b. The "beta test" (i.e., the KAI Transactions) did not provide Company-1 or the Company-1 Affiliate "the ability to prevent the purchase of non human or fraudulent advertising traffic." In fact, the KAI Agreements did not even contemplate the pre-impression scanning of Company-1's or the Company-1 Affiliate's data such that, if fraud were identified, Company-1 or the Company-1 Affiliate could "prevent the purchase of non human or fraudulent advertising traffic." Instead, the KAI Agreements specifically contemplated that KAI would "process and score *post* impression data." (emphasis added).

c. There was no factual basis at all for the statement that KAI "was identifying and preventing approximately 300% more digital ad fraud then the client's [i.e., Company-1 and the Company-1 Affiliate] current partners." Because Company-1 and the Company-1 Affiliate did not provide Kubient with any data to scan, KAI did not identify or prevent *any* ad fraud for Company-1 or the Company-1 Affiliate, let alone "300% more" than their current partners.

56. The IPO Registration Statements also reported Kubient's net revenues for the first quarter of 2020 as $1,381,913. They explained: "For the three months ended March 31, 2020, net revenues increased by $1,325,107, or 2,333%, to $1,381,913 from $56,806 for the three months ended March 31, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with beta testing of KAI, our fraud detection service, which commenced during the 2020 period." By this time, Kubient had invoiced Company-1 $1,300,338.03 for the KAI Agreements, all of which Kubient improperly recognized as revenue. Accordingly, the Fraudulent Revenue was more than 94% of Kubient's revenue as reported in the IPO Registration Statements.

57. The footnotes to the financial statements in the IPO Registration Statements explained that Kubient recognized revenue under FASB Accounting Standards Codification Topic

606, Revenue From Contracts With Customers ("ASC 606"). Specifically, the IPO Registration

Statements stated that Kubient "determines revenue recognition through the following steps: [1]

Identification of a contract with a customer; [2] Identification of the performance obligations in

the contract; [3] Determination of the transaction price; [4] Allocation of the transaction price to

the performance obligations in the contract; and [5] Recognition of revenue when or as the

performance obligations are satisfied." The footnotes to the financial statements in the IPO

Registration Statements also explained how Kubient applied ASC 606 to the KAI Transactions:

> Beginning during the three months ended March 31, 2020, the
> Company recognized revenue in connection with contracts to scan a
> customers' first-party anonymized data with the Company's
> proprietary patent-pending artificial intelligence product ("KAI").
> Upon completion of the scan, the Company delivered a report to the
> customer, which is the point in time the Company satisfied the
> performance obligation. The Company acts as the principal for these
> contracts, as it is primarily responsible for fulfilling the promise to
> provide the services and has discretion in establishing the price of
> service. As a result, the Company recognizes revenue on a gross
> basis. During the three months ended March 31, 2020 and 2019, the
> Company recognized aggregate revenue of $1,300,338 and $0,
> respectively, in connection with the contracts.

(the "KAI Revenue ASC 606 Section"). In fact, however, Kubient never scanned Company-1's or

the Company-1 Affiliate's "first-party anonymized data" with KAI and never "delivered a report

to" Company-1 or the Company-1 Affiliate with results. Accordingly, Kubient did not satisfy its

performance obligations under the KAI Agreements and, therefore, could not recognize the $1.3

million of revenue under ASC 606.

58.    The Audit Firm had concluded its review of Kubient's first quarter financial

statements immediately before the filing of the July 2, 2020 Form S-1 registration statement. On

or about July 2, 2020, in connection with the preparation of Kubient's quarterly financial

statements, Kubient delivered a management representation letter to the Audit Firm, signed by

PAUL ROBERTS, the defendant, and others, in which ROBERTS falsely represented, among other things:

a. "There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial statements."

b. "We have no knowledge of any fraud or suspected fraud affecting the Company involving: a. management;" and,

c. "The Company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance."

59.     In the lead-up to its IPO, Kubient made presentations to potential investors during which it touted KAI and the revenue it had recognized in connection with the KAI Transactions. A slide-presentation that Kubient filed with the SEC as a free writing prospectus on or about July 30, 2020 (the "July Investor Presentation") identified Kubient's proprietary KAI ad-fraud prevention technology as one of Kubient's "investment highlights." The July Investor Presentation claimed that advertisers lost $42 billion to ad fraud in 2019 and that ad fraud was expected to reach $100 billion by 2023. The July Investor Presentation stated that KAI was the "industry['s] first pre-bid ad fraud detection and prevention" system and that it "would address "the $42 billion ad fraud problem." The July Investor Presentation also highlighted the revenue Kubient recognize from the KAI Transactions:



60.    On or about August 11, 2020, Kubient announced the pricing of its IPO. On or about August 12, 2020, Kubient's shares began trading on the Nasdaq stock exchange at $5 per share under the ticker "KBNT." The IPO closed on or about August 14, 2020. Kubient received gross proceeds of approximately $12.5 million from its IPO, before deducting underwriting discounts and commissions and other estimated offering expenses.

**Kubient and Company-1 Complete the Fraudulent Transaction**

61.    On or about August 26, 2020, Employee-1 wired Company-1 $500,000 from the Kubient Bank Account. Accordingly, as of on or about August 26, 2020, Company-1 had paid Kubient $855,020.91 in connection with the KAI Agreements, and Kubient had paid Company-1 $855,019 in connection with the Data Services Agreement, even though neither company provided any of the services required under the applicable contracts to the other.

62.    On or about November 4, 2020, Employee-1, at the direction of PAUL ROBERTS, the defendant, wired Company-1 $445,317 from the Kubient Bank Account. On or about November 6, 2020, Company-1 wired $445,317.12 to the Kubient's Bank Account—12 cents

more than Kubient wired Company-1 from the same bank account two days earlier, and precisely the amount that was owed to Kubient under the KAI Agreements Invoices. The table below summarizes the payments between Kubient and Company-1 as of November 6, 2020:

| Date | Company-1 Payments to Kubient | Kubient Payments to Company-1 |
|---|---|---|
| January 21, 2020 | $855,020.91 | |
| January 31, 2020 | | $255,019 |
| February 28, 2020 | | $100,000 |
| August 26, 2020 | | $500,000 |
| November 4, 2020 | | $445,317 |
| November 6, 2020 | $445,317.12 | |
| **Total:** | **$1,300,338.03** | **$1,300,336** |

As of on or about November 6, 2020, Company-1 had paid its outstanding KAI Agreements Invoices in full—only $2.03 more than what Kubient had paid Company-1 pursuant to the Data Services Agreement.

### ROBERTS Makes Material Misrepresentations in Kubient's Form 10-Q for the Third Quarter of 2020 and in a Management Representation Letter to the Audit Firm

63.     As a public company, Kubient was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public. Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, Kubient was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected Kubient's business transactions.

64.     On or about October 31, 2020, the Board of Directors of Kubient appointed PAUL ROBERTS, the defendant, who, at the time, was Kubient's Chief Strategy Officer, President and Chairman of the Board of Directors, as Interim Chief Executive Officer of the company.

26

65.    On or about November 13, 2020, Kubient filed with the SEC its quarterly financial report for the third quarter of 2020 on SEC Form 10-Q. PAUL ROBERTS, the defendant, signed the Form 10-Q as Kubient's principal executive officer. The Form 10-Q repeated many of the same misrepresentations about KAI contained in the IPO Registration Statements including that "Kubient was able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic;" and, with respect to the application of ASC 606 to the KAI transactions, that "[u]pon completion of the [KAI] scan, the Company delivered a report to the customer, which is the point in time the Company satisfied the performance obligation." The Form 10-Q also reported that, for the nine-month period ending September 30, 2020, Kubient recognized net revenue of $1,753,851, of which $1,300,338 (or approximately 74%) was the Fraudulent Revenue from the KAI Transactions.

66.    Along with its quarterly financial report for the third quarter of 2020, Kubient also filed a certification entitled, "Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002," (the "3Q2020 SOX Section 302 Certification") in which PAUL ROBERTS, the defendant, falsely certified, in part:

a.    "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;"

27

b. "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;" and,

c. "I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)...(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

67.    Along with its quarterly financial report for the third quarter of 2020, Kubient also filed a second certification entitled "Certifications of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which PAUL ROBERTS, the defendant, falsely certified, in part:

a. "The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2020, to which this certification is attached as Exhibit 32.1 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

b. "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

68.    The Audit Firm had concluded its review of Kubient's financial statements for the nine-month period ending September 30, 2020 immediately before Kubient filed with the SEC its quarterly financial report for the third quarter of 2020 on SEC Form 10-Q. On or about November 12, 2020, in connection with the preparation of Kubient's financial statements, Kubient delivered a management representation letter to the Audit Firm, signed by PAUL ROBERTS, the defendant, and others, in which ROBERTS falsely represented, among other things:

28

    a.  "There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial statements."

    b.  "We have no knowledge of any fraud or suspected fraud affecting the Company involving: a. management;" and,

    c.  "The Company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance."

**ROBERTS Makes Material Misrepresentations in**
**Kubient's Secondary Offering Registration Statement**

    69.  In anticipation of a secondary public offering, on or about December 21, 2020, Kubient filed a registration statement on SEC Form S-1, which was signed by, among others, PAUL ROBERTS, the defendant, as the Interim Chief Executive, Chief Strategy Officer, President and Chairman of Kubient (the "Secondary Offering Registration Statement").

    70.  In the Secondary Offering Registration Statement, PAUL ROBERTS, the defendant, repeated many of the same misrepresentations about KAI contained in the IPO Registration Statements and Kubient's quarterly financial report for the third quarter of 2020 on SEC Form 10-Q, including that "Kubient was able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic;" that "[t]he results from the two beta clients indicated that KAI was identifying and preventing approximately 300% more digital ad fraud then the clients' current partners;" and, with respect to the application of ASC 606 to the KAI Transactions, that "[u]pon completion of the [KAI] scan, the Company delivered a report to the customer, which is the point in time the Company satisfied the performance obligation." In the Secondary Offering Registration Statement, Kubient reported the same net revenue numbers that it reported in its quarterly financial

29

report for the third quarter of 2020 on SEC Form 10-Q: $1,753,851, of which $1,300,338 (or approximately 74%) was from the KAI Transactions.

71.    On or about December 28, 2020, Kubient's secondary public offering closed and the company received total gross proceeds of approximately $20.7 million, prior to deducting underwriting discounts, commissions and offering expenses payable by the Company.

## ROBERTS Continues to Cover-Up His Fraud

72.    After Kubient filed its Secondary Offering Registration Statement, Employee-1 discovered that Kubient did not scan data from Company-1 or the Company-1 Affiliate in connection with the KAI Transactions. Upon reviewing the files in the Data Folders, which PAUL ROBERTS, the defendant, directed Employee-2 to populate with some of Kubient's own data, Employee-1 learned that the files could not have been provided by Company-1 or the Company-1 Affiliate, and that the data was, in fact, data extracted from Kubient's own internal systems from partners that had no relation to Company-1.

73.    On or about the evening of December 22, 2020, Employee-1 sent a message to a member of Kubient's Audit Committee of the Board of Directors, stating "Urgent we need to talk now, as member of audit committee." Later that evening, Employee-1 spoke to the Audit Committee member by phone and reported what Employee-1 had discovered about the KAI data. The substance of that conversation was later reported to PAUL ROBERTS, the defendant, and Employee-3, among others.

74.    After Employee-1's discovery about the KAI data on or about December 22, 2020, PAUL ROBERTS, the defendant, did not come forward to Kubient's executives, directors, employees, lawyers, internal accountants, or the Audit Firm with the truth about the KAI Transactions: that Company-1 and the Company-1 Affiliate never sent Kubient any data to be

30

scanned by KAI, that Kubient never scanned any Company-1 or Company-1 Affiliate data with KAI, and that Kubient never delivered any results or reports to Company-1 or the Company-1 Affiliate with any findings by KAI. Instead, ROBERTS continued to conceal his fraudulent scheme. For example, on or about December 23, 2020, Employee-3 sent a message to ROBERTS, asking "Could someone have replaced the data in the [Company-1] file with k [i.e., Kubient] data? I And forgotten to rename the folder." ROBERTS responded, "Very very possible." ROBERTS did not tell Employee-3 that ROBERTS had, in fact, directed Employee-2 to populate the Data Folders with Kubient's own data in or about February 2020.

75.     To further cover-up his fraudulent scheme after Employee-1's discovery, PAUL ROBERTS, the defendant, enlisted the assistance of a Company-1 employee (the "Company-1 Employee"). On or about December 23, 2020, the Company-1 Employee sent ROBERTS a calendar invite for a meeting titled "Kubient/[Company-1] sync up" with the location "Paul to call [Company-1 employee first name]" for later that day. The call took place as scheduled and lasted for approximately 10 minutes.

76.     On or about December 28, 2020, Employee-3 messaged ROBERTS, "Any updates/changes on last weeks fiasco?," meaning Employee-1's discovery about the KAI data. ROBERTS responded, "I have the solution in place, will start sending emails etc today." Then, on or about December 29, 2020, ROBERTS sent an email to the Company-1 Employee, copying Employee-3, stating in part:

> If you recall, we ran a 90 day test of our fraud prevention product with [Company-1]/[the Company-1 Affiliate]. During a recent internal review, we discovered that the data used during that test may not have originated from [Company-1]/[the Company-1 Affiliate]. I apologize for this and would like to offer a solution that satisfies you and your team.

Kubient can retest your data using KAI at no cost as per the
agreement terms or offer any suitable solution you can provide.

77.    A few hours later, on or about December 29, 2020, the Company-1 Employee
responded to PAUL ROBERTS, the defendant, saying that Company-1 had "received a ton of
value from" Kubient and declining ROBERTS's offer to "rescan" Company-1's "traffic." Both
ROBERTS and the Company-1 Employee knew that Kubient had not provided Company-1 with
any legitimate "value" in connection with the KAI Agreements.

## ROBERTS Makes Material Misrepresentations in Kubient's Form 10-K for
## 2020 Fiscal Year and in a Management Representation Letter to the Audit Firm

78.    On or about March 30, 2021, Kubient filed with the SEC its annual financial
statement for the 2020 fiscal year on SEC Form 10-K. PAUL ROBERTS, the defendant, signed
the Form 10-K as Kubient's principal executive officer. The Form 10-K repeated many of the same
misrepresentations about KAI contained in Kubient's prior SEC filings including that "Kubient
was able to successfully ingest hundreds of millions of rows of data in real-time and provide our
clients the ability to prevent the purchase of non-human or fraudulent advertising traffic;" that
"[t]he results from the two beta clients indicated that KAI was identifying and preventing
approximately 300% more digital ad fraud then the clients' current partners;" and, with respect to
the application of ASC 606 to the KAI Transactions, that "[u]pon completion of the [KAI] scan,
the Company delivered a report to the customer, which is the point in time the Company satisfied
the performance obligation." ROBERTS persisted in these misrepresentations, notwithstanding
Employee-1's discovery about the KAI Transactions. The Form 10-K also reported that, for 2020,
Kubient recognized net revenue of $2,900,029, of which $1,300,338 (or approximately 45%) was
from KAI Transactions.

32

79.    Along with its annual financial statement for 2020, Kubient also filed a certification entitled, "Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002," in which PAUL ROBERTS, the defendant, falsely certified, in part:

a.    "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;"

b.    "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;" and,

c.    "I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)...(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

80.    Along with its annual financial statement for 2020, Kubient also filed a second certification entitled "Certifications of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which PAUL ROBERTS, the defendant, falsely certified, in part:

a.    "The Company's Annual Report on Form 10-K for the year ended December 31, 2020, to which this certification is attached as Exhibit 32.1 (the 'Report') fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934;" and

33

b. "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

81.    The Audit Firm had concluded its review of Kubient's annual financial statements for 2020 immediately before Kubient filed with the SEC its Form 10-K for 2020. On or about March 29, 2021, in connection with the preparation of Kubient's financial statements, Kubient delivered a management representation letter to the Audit Firm, signed by PAUL ROBERTS, the defendant, and others, in which ROBERTS falsely represented, among other things:

a. "We have disclosed to you if we are aware of any risks that the financial statements may be materially misstated as a result of fraud."

b. "We have not received any communications, nor do we have knowledge of any fraud, allegations of fraud or suspected fraud affecting the entity involving: a. Management;"

c. "There are no ...(c) material transactions that have not been properly recorded in the accounting records underlying the financial statements."

d. "The Company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance."

## The Audit Firm and ROBERTS Resign

82.    In or about September 2023, after learning of the fraudulent scheme by PAUL ROBERTS, the defendant, the Audit Firm resigned as Kubient's independent registered accounting firm, withdrew its reports on Kubient's financial statements for the years 2020, 2021 and 2022, including Kubient's annual reports on Form 10-K for the years 2020, 2021 and 2022, and notified Kubient that it declined to be associated with the company's quarterly financial statements and Forms 10-Q for the periods ended March 31, 2020, June 30, 2020, September 30,

2020, March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, September 30, 2022, and March 31, 2023.

83.    On or about September 20, 2023, as a result of the Audit Firm's notices, the Board of Directors of Kubient accepted the Audit Firm's resignation and concluded that the company's previously issued financial statements for the years 2020, 2021 and 2022, and the company's quarterly financial statements and Forms 10-Q for the periods ended March 31, 2020, June 30, 2020, September 30, 2020, March 31, 2021, June 30, 2021, September 30, 2021, March 31, 2022, June 30, 2022, September 30, 2022, and March 31, 2023 should no longer be relied upon.

84.    On or about September 22, 2023, the Board of Directors of Kubient placed PAUL ROBERTS, the defendant, on paid administrative leave from his positions as Chief Executive Officer, Chief Strategy Officer, and President of Kubient pending an internal investigation conducted by outside legal counsel on behalf of a special committee of the Board. ROBERTS also resigned from his position as Chairman and member of the Board pending the internal investigation. The Board accepted ROBERTS's resignation effective as of September 22, 2023.

85.    On or about November 2, 2023, PAUL ROBERTS, the defendant, resigned from his positions as Chief Executive Officer, Chief Strategy Officer, and President of Kubient.

86.    On or about November 17, 2023, Kubient's shares were voluntarily delisted from the Nasdaq stock exchange, with a share price of approximately $0.10 when the market closed on or about November 16, 2023.

### ROBERTS's Share Ownership and Bonuses

87.    At all times relevant to this Information, PAUL ROBERTS, the defendant, was Kubient's largest shareholder. As of on or about August 11, 2020 (three days before the Kubient's IPO), ROBERTS owned more than two million shares, or approximately 57.31% of Kubient's

35

shares. As of on or about February 26, 2021, ROBERTS's more than two million shares were approximately 18.62% of the company's shares. While ROBERTS did not sell his Kubient shares, in or about February 2021, Kubient's share price reached an all-time high of approximately $16.26 per share, making ROBERTS's shares worth more than $32 million at the time.

88.     In or about 2021, PAUL ROBERTS, the defendant, received a $250,000 bonus tied to Kubient's IPO in or about August 2020, and another $250,000 bonus tied to Kubient's secondary public offering in or about December 2020, both of which offerings would not have been possible without ROBERTS's fraudulent misrepresentations about the "success[]" of the "invaluable" KAI "beta tests."

## **Statutory Allegations**

89.     From at least in or about October 2019 through at least in or about March 2021, in the Southern District of New York and elsewhere, PAUL ROBERTS, the defendant, willfully and knowingly, directly and indirectly, by use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, ROBERTS executed a scheme to defraud investors of Kubient, Inc., during which he caused Kubient to improperly recognize more than $1.3 million in fraudulent revenue in Kubient's financial statements and made material misrepresentations to Kubient's investors about

the efficacy of Kubient's proprietary fraud detection tool, Kubient Artificial Intelligence ("KAI"), and transactions involving KAI.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

90.    As a result of committing the offense alleged in Count One of this Information, PAUL ROBERTS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

91.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

Damien Williams

DAMIAN WILLIAMS
United States Attorney